The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Richard B. Ford and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
*******************
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between employee-plaintiff and employer-defendant on November 17, 1992 and February of 1996.
3. All Industrial Commission forms are stipulated into evidence.
4. Medical records from the employee-plaintiff's treating physicians are stipulated into evidence.
5. Both parties stipulate that the employee-plaintiff suffered an injury by accident on November 17, 1992 to her low back, and that she ultimately returned to work at her full wages.
6. Both parties stipulate that the employee-plaintiff's last day of work at Belk's was June 3, 1996.
*******************
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. Plaintiff suffered a compensable spine injury on November 17, 1992. This injury was the subject of a Form 21 agreement approved by the Industrial Commission in I.C. File No. 283918. Ferguson received indemnity and medical benefits for this injury, including benefits for permanent partial disability under Form 26. File numbers 616956 and 620117 are not at issue with respect to this appeal.
2. Plaintiff began working for Belk Stores in March, 1990. She was employed as a "retailing selling specialist" for Calvin Klein Cosmetics, which included responsibility for modeling, personnel issues, inside and outside promotions, coordinating events, sales and public relations. Her supervisor was Ms. Judy Jones from March, 1990, to the date that Plaintiff last worked, June 2, 1996.
3. On November 17, 1992, Plaintiff, while working at the Belk store in Cary, NC, bent "into one of the fragrance cases," and when she tried to get up, her "back just popped." Her "bladder lost control" and she could not get up. She reported her injury to the area sales manager, and missed work for a period of approximately three months.
4. Plaintiff began treating with Dr. Steven Montgomery of the Raleigh Orthopaedic Clinic, who "thought [she] should have surgery." Plaintiff did not want to have surgery, and entered physical therapy.
5. Plaintiff resumed working on a part-time basis in March, 1993, and received the temporary total and temporary partial disability benefits to which she was entitled. On July 12, 1993 she returned to work full time.
6. On 12 July 1993 Plaintiff executed a Form 26 based on a 2.5% permanent partial disability rating to the back provided by Dr. Montgomery. According to this Agreement, Defendants agreed "to pay and to accept compensation beginning the said 12th day of July, 1993, at the rate of $320.02 per week for 7.5 weeks." [Simple math indicates that this would be $2,400.15.]
7. No weekly checks were received by Plaintiff from Defendants in accordance with the terms of the agreement under Form 26 at any time during July or August, 1993. Sometime around September 1, 1993, however, Plaintiff received a check in the amount of $2,400.00. No letter or documentation accompanied this check explaining its purposed. As a single mother, Plaintiff was "ecstatic." However, she "didn't know what it was for." Plaintiff thought that the check was a "mistake."
8. In order to "find out" the purpose of the check, she called Tom Fingstad, the claim representative responsible for handling her file at the time. Fingstad responded, misinforming her that the check represented "the difference in my pay that I'd lost and that it was my check" rather than stating that it was payment for permanent partial disability. At no time during this conversation did Fingstad advise Plaintiff that the case was being closed. In reliance upon Fingstad's misrepresentations, Plaintiff cashed the check on or about September 9, 1996.
9. No evidence was presented by Defendants at the hearing to refute the fact that this conversation occurred with Fingstad or to challenge the substance of the conversation. Mr. Fingstad did not testify nor was mention made of taking his deposition, although Ms. Elva Manus, the claim specialist for Defendant-Carrier Risk Enterprise Management (REM) and witness called by Defendant, acknowledged that Mr. Fingstad still worked for REM in Atlanta. Furthermore, Manus acknowledged that oral conversations between claimants and adjustors were memorialized on computer. Yet, no computer document was offered to rebut the substance of this conversation between Fingstad and Plaintiff.
10. Additionally, Plaintiff testified that she never received a Form 28B. Plaintiff never received anything in connection with her workers' compensation case that was printed on green paper or a copy of it. "[N]obody let me know anything." A copy of Form 28B dated October 15, 1993 was stipulated to by the parties. However, there is no "file stamp" reflected on the Exhibit to indicate that the Form has in fact been filed with the Industrial Commission.
11. At the time Plaintiff's case was "closed" as reflected in the Form 28B, "total compensation and medical paid" was $18,459.24. However, Defendants' claim summary dated 2/27/96 indicates a "Paid to Date" amount of $19,014.71. Thus, although the case had been "closed", Defendants made additional payments on this claim in the amount of $555.47.
12. Manus, the sole witness offered by Defendant at the hearing, testified that her employment with REM began on June 24, 1996, or just five months prior to the hearing. Although Manus had reviewed Plaintiff's claims file prior to the hearing, she had no personal knowledge regarding the handling of the same or procedural issues attendant to it. She testified that the claim representative handling this file at the time of the payment of permanent partial disability benefits, and at the time that the Form 28B was prepared, was Tom Fingstad.
13. From the "payment detail" kept by REM, Manus testified that Plaintiff received a payment for permanent partial disability in the amount of $2,400.15. According to Manus, a file is ordinarily closed "[w]ith the final payment of compensation and the filing of Form 28B. As to the procedures used by REM for "closing" workers' compensation cases, Manus testified that this entailed receiving a disability rating from the physician, filing of Form 25R, issuance of Form 26, payment to the claimant and filing of Form 28B. However, Mucus admitted she had no personal knowledge as to whether or not this procedure was followed in this case back in 1993. "No[,] [o]f course, I wasn't present." Manus acknowledged that she was not employed by REM until 1996 and her claim file contained no "written communications sent to plaintiff at any time since November 17, 1992."
14. From the "payment detail" kept by REM, Manus testified that Plaintiff received a payment for permanent partial disability in the amount of $2,400.15. According to Manus, a file is ordinarily closed "[w]ith the final payment of compensation and the filing of Form 28B. As to the procedures used by REM for "closing" workers' compensation cases, Manus testified that this entailed receiving a disability rating from the physician, filing of Form 25R, issuance of Form 26, payment to the claimant and filing of Form 28B. However, Mucus admitted she had no personal knowledge as to whether or not this procedure was followed in this case back in 1993. "No[,] [o]f course, I wasn't present." Manus acknowledged that she was not employed by REM until 1996 and her claim file contained no "written communications sent to plaintiff at any time since November 17, 1992."
15. Manus also testified that Form 28B, dated October 15, 1993, was not mailed to Plaintiff with the check representing payment of permanent partial disability benefits. Although Form 28B contained a notation, "cc: claimant," she acknowledged that she neither prepared nor mailed Form 28B to Plaintiff and does not know whether Plaintiff ever received Form 28B.
16. After cashing the check, which unbeknownst to her was not what Fingstad had represented it to be, Plaintiff continued to seek and obtain medical care from Dr. Montgomery. In October, 1994 Plaintiff returned to Raleigh Orthopaedic Clinic, seeing Dr. Leonard Nelson, complaining of a 5-day history of leg pain resulting from heavy lifting and unloading. Her physical examination revealed a "significantly antalgic gait on the left. She ambulates in a guarded fashion." Diagnosing left leg radiculopathy, Plaintiff's physician recommended she stay out of work for at least five days and return only on a light duty basis.
17. On October 25, 1994, Plaintiff returned for a follow up with Dr. Montgomery. At that time Dr. Montgomery noted that Plaintiff was "back working" and her leg was "much improved."
18. The facts surrounding the receipt of the check and the responses by the insurance company representative as to what the check represented and the lack of facts showing that Plaintiff received a Form 28B constitute grounds for application of the doctrine of equitable estoppel so that Defendants are estopped from raising the statute of limitations with respect to Plaintiff's claim for change of condition.
19. In February, 1996, Plaintiff "didn't do anything that caused her condition to change, but her spinal condition worsened. She notified "Jamie" of the Human Resources department at Belk, with whom she had spoken on numerous occasions before. "Jamie" referred Plaintiff to a person named David Stokes, who apparently had been assigned to her file by the carrier.
20. Plaintiff was informed by Stokes that she was "no longer covered." Plaintiff was "shocked," and asked Stokes, "[w]hy didn't someone tell me?" Stokes responded by telling Plaintiff that she had a two year limitation and that I should have known through a letter, and I had no letter."
21. No letter was offered by Defendants at the hearing to show the existence of this alleged "letter." Manus had no personal knowledge as to whether or not such correspondence existed.
22. Plaintiff saved her medical records and other documents related to her claim. She kept them in a file. Prior to the hearing, she reviewed her file and went through everything . . . [and has not] seen this form [Form 28B]."
23. Stokes sent Plaintiff a letter dated February 20, 1996 denying her claim. Stokes' letter stated that "any future medical treatments will not be accepted." The reason for Defendants' denial of medical benefits is not clear, especially in light of their attorney's comments to the effect that medical expenses will be paid.
24. Plaintiff experienced a dramatic change in her condition in February, 1996. "It was the same pain I'd probably had in '95, and it was just worse. It was so far down into my leg." She purchased twenty pairs of shoes "just trying to get where [she] could work." The pain "radiated from my butt all the way down my leg" and to her right leg, calf, foot and toes.
25. At the time of her injury, Plaintiff's pain did not even approach that which she experienced in February, 1996. The pain and other changes in Plaintiff's symptoms affected her ability to continue working. She could not sit and work, couldn't "do the quality of work" she was accustomed to, and "couldn't stand" due to the pain. She "could not tolerate" the pain anymore. Plaintiff underwent surgery in June, 1996.
26. Vonda Brannon, a co-worker of Plaintiff's who observed her at work in 1996, testified that Plaintiff was "having a lot of problems with her back . . . difficulty standing up [and] couldn't walk straight." "It was kind of over." According to Brannon, Plaintiff could walk normally in the fall of 1993.
27. Prior to a full evidentiary hearing on the issue of change of condition, however, the Deputy Commissioner dismissed the claim as being beyond the two year statute of limitations and he ruled that the facts of the case did not indicate that equitable estoppel would toll the running of the two-year statute of limitations.
*******************
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On November 17, 1992, employee-plaintiff sustained an injury by accident arising out of and in the course of her employment.
2. Employer-defendant is responsible for employee-plaintiff's ongoing medical treatment for injuries growing out of the 17 November 1992 injury by accident pursuant toHyler v. GTE Prods. Co., 333 N.C. 258, 425 S.E.2d 698 (1993).
3. Defendants are estopped from raising a statute of limitations defense, based on substantial evidence showing inherent unfairness by Defendants through their misrepresentations and failure to provide notice to Plaintiff of her limitations period. Plaintiff relied on such misrepresentations to her detriment. Additionally, Sides v. Weaver Sons Electric Co.,12 N.C. App. 312, 183 S.E.2d 308 (1971), indicates that the receipt by the claimant of a Form 28B along with the last check payment is required to trigger the two-year statute of limitations.
*******************
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
AWARD
1. Employer-defendant shall be responsible for the employee-plaintiff's continuing medical expenses related to her 17 November 1992 injury by accident (including any outstanding bills for prior treatment).
2. Defendants' Motion to Dismiss plaintiff's claim for a change of condition is DENIED and Defendants are foreclosed from pleading a two-year statute of limitations by the doctrine of equitable estoppel.
3. This matter shall be remanded to the Deputy Commissioner level for an evidentiary hearing on the issue of change of condition.
4. Defendants shall pay the costs.
 S/ _______________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ______________________ COY M. VANCE COMMISSIONER
DISSENTING:
S/ ______________________ DIANNE C. SELLERS COMMISSIONER